## Page 4

TARIQ KHRAISHI, Ph.D.,
after having been first duly sworn under oath,
was questioned and testified as follows:
                        EXAMINATION
BY MR. ERICKSON:
    Q.   Would you state your full name for the record, please?
    A.   Tariq Khraishi.
    Q.   And what do you do for a living?
    A.   I am a professor of mechanical engineering at UNM.
    Q.   Okay.  Have you ever had your deposition taken before?
    A.   I did, yes.
    Q.   And how many depositions have you been involved in, to your recollection?
    A.   I believe two.
    Q.   Okay.  Let me just go over some basic guidelines so we are on the same page.
    A.   Yes.
    Q.   I will be asking you questions today.
    A.   Okay.
    Q.   You should be careful to try not to speak while I am speaking, and I will try to do the same while you are speaking.

## Page 44

    Q.   Where was that?
    A.   Washington State University.
    Q.   Okay.  In your role as a professor of mechanical engineering, do you assign engineering problems sets to your students?
    A.   Yes.
    Q.   And what are your requirements for grading the work that is done when you assign engineering problems sets to your students?
    A.   What are my requirements?  If they want full credit, they need to show full work.
    Q.   Okay.  And tell me what that means, to "show full work."
    A.   If they got the right methodology and answers, that's called "full work."
    Q.   Okay.  And so I take it you require them to show the full work that they do to analyze the problems set that's been put before them?
    A.   It could be different methodologies.  It doesn't have to be -- I am not rigid on the specific one.  If it's technically sound methodology, you know, that's good, if they are aware of different ones, but the answer is typically, because these are very specific type problems, normally, they have one answer.
    Q.   Okay.  And you require them to show you the

[EXHIBIT A]

## Page 45

work that they did to get to that answer; is that correct?
    A.   Yes, of course, they have to show work, not just put an answer.
    Q.   So, for example, if they have run calculations, they have to show you the calculations they ran; is that correct?
    A.   If they run calculations, for example, yes, they have to show those calculations.
    Q.   And if they use a particular method or technique to analyze the engineering problems set, they have to show you that, as well; is that correct?
    A.   Yes.
    Q.   And they have to tell you engineering principles that they employed in the process of reaching their conclusion, as well; is that right?
    A.   I mean, typically, the principles are embedded into their math and equations.  So they don't necessarily explicitly name the principle, but they -- because that's part of normally a specific class where they are all taught about those specific principles.
    Q.   Okay.
    A.   So I don't necessarily tell them, "Give me the name of it," per se, because the equation, many times, relates to that principle, or equivalent of that

## Page 46

principle.
    Q.   Okay.
         MR. TRAVERS:  Is there a time that we can have a break?  We have been going about an hour.  I do need some coffee.
         MR. ERICKSON:  Okay.  We can take a break now.
         MR. TRAVERS:  Okay.  Thank you.
         (Recess taken from 10:02 to 10:11 a.m.)
         MR. ERICKSON:  Back on the record.
    Q.   (By Mr. Erickson)  So, Dr. Khraishi, can you tell me what mechanical engineering tools and methodologies you used in evaluating the issues in this case that we are involved in today?
    A.   The principles of fracture mechanics, materials science also.
    Q.   Okay.  Principles of material science?
    A.   Yes, material science and manufacturing/design.  They are normally interconnected.  Slash meaning it's -- yes.
    Q.   Meaning /stress design?
    A.   Design, yes.
    Q.   Okay.  Any other methodologies that you employed in analyzing the problem in this case?
    A.   I'm trying to think.  I mean, evidence,

1  what do you call, martensite, m-a-r-t-o-n-s-i-t-e, groove.
2  phase, p-h-a-s-e.
3         And, anyway, the martensite phase could form
4  -- it could form more on certain materials than
5  others. Also, the heat treatment, for example, as it
6  relates to cooling rates, could also cause a more
7  brittle phase like the martensite to form, and that
8  could cause breaking things easier, like the welds and
9  the metal and so forth where the welds are.
10     Q.  And which source did you rely on for the
11 discussion of embrittlement that you are describing?
12     A.  The Materials Science --
13     Q.  Okay.
14     A.  -- book.
15     Q.  Were there any other principles of fracture
16 mechanics that you applied in this matter besides what
17 you just described to me?
18     A.  This is not principles of fracture
19 mechanics. This is the causes of embrittlement. And
20 then after that, if you have an embrittled-type
21 material that causes it to fracture easier, to break
22 easier, in other words, and yes, I utilized another
23 one, because in this particular case, their welding
24 process was not done right and it caused an ingress,
25 "ingress" meaning like a small fracture end, small

2      An ingress, i-n-g-r-e-s-s, caused an ingress
3  into the metal, the links, metal links, and that metal
4  link combined potentially with embrittlement in the
5  microstructure, meaning a martensitic or hard phases
6  caused things to break down, to fracture easier, and
7  when that fracture happened, it destabilized the
8  structure, meaning it would tilt it to, you know, a
9  certain number of degrees that would cause instability
10 for somebody unexpecting who is stepping on it.
11     Q.  And we are going to get to your opinions, Dr.
12 Khraishi. Right now, I am just trying to understand
13 the methodologies that you used.
14     A.  (Witness nods head.)
15     Q.  And so my question was just, are there other
16 methodologies that you employed --
17     A.  Yes. The principles of fracture --
18     Q.  Let me finish my question.
19     A.  (Witness nod head.)
20     Q.  Were there other methodologies that you
21 employed under that heading that you gave me of
22 "fracture mechanics" to analyze the problems here
23 other than what you just told me?
24     A.  Yes. Yes.
25     Q.  What?

1      A.  Yes. I mentioned another one, which is also
2  the type of steel that is being welded. There are some
3  that are more prone to formation of those hard phases
4  at the micro level, and some are not. Again, I
5  mentioned that earlier.
6      Q.  Okay. I am having a hard time understanding
7  how that's a methodology. I mean, that sounds like
8  knowledge that you have about materials science, but I
9  am asking more about methodologies that you used to
10 analyze these problems, not so much right now the
11 specific knowledge that you have from materials
12 science.
13     A.  Yes.
14     Q.  But more methodologies.
15     A.  I mean, if you're referring to simulations
16 like we were talking earlier, I did not do a
17 simulation, if that's what you are trying to --
18     Q.  And why didn't you do a simulation?
19     A.  Because I saw in the evidence enough to
20 support my opinion how things transpired in terms of
21 all my expertise and knowledge in these areas.
22     Q.  Okay. The third --
23     A.  Normally, we do simulations when you have to,
24 when you think -- because the simulations are expensive
25 to do. You don't resort to it unless you think there

1  used to evaluate manufacturing/design concepts?
2      A.  Is the welding process.
3      Q.  All right. And how is that a methodology?
4      A.  So methodology -- again, I don't know what
5  you are trying to refer to in the "methodology," if
6  you're referring to simulations or not, but, you know,
7  in this particular case, again, the welding, they did
8  it in a way where, you know, the welding spots were --
9  would end up reducing an ingress.
10        So that's part of -- the designers of these
11 stairs or steps, they need to think ahead of time where
12 is the placement of welds and how that would cause
13 ingresses or not, because those ingresses, again,
14 could, according to fracture mechanics books, could
15 cause further fracture and further breakage.
16        So that's, again, part of what people in
17 manufacturing are taught. They have to think about how
18 the layout and how the process should go exactly
19 without causing further problems down the line.
20     Q.  Okay. Were there mechanical engineering
21 tools or methods or numerical techniques that you have
22 at your disposal for modeling and determining the
23 stresses on objects that you could have employed that
24 you did not?
25     A.  No, I did not have to do any of this. That's

55

1  what I am trying to explain.
2      Q.   Yes, I understand that you are saying that
3  you didn't feel you needed to do it.
4      A.   Yes.
5      Q.   I am just asking you, are there such
6  engineering tools and methods and techniques that you
7  could have employed, but chose not to?
8      A.   In principle, if, you know, -- you know, if
9  you study the problem in a lot of detail, you could try
10 to involve, you know, numerical tools or something.
11     Q.   Uh-huh.
12     A.   But, again, you don't resort to these things,
13 which are time-consuming and expensive, unless you
14 think there is a need to do that.  That's what we teach
15 our students, you don't do -- go the time-consuming
16 route and expensive route when there is no need to do
17 that.  That's a waste of time and money.
18     Q.   And you felt here that there wasn't a need to
19 do any of those kinds of techniques or methodologies?
20     A.   No.  You don't need to.
21     Q.   Okay.  Did you employ the finite element
22 analysis in your work on this case?
23     A.   No.  That's part of numerical techniques that
24 are very expensive.  Again, you only employ it if you
25 feel, you know, you have to employ it.

56

1      Q.   Okay.  Could the finite element analysis have
2  been employed for estimating the stresses and stiffness
3  and deflection of the RV steps in this case?
4      A.   You could use numerical tools to estimate
5  deflections, the exact stresses.  It's probably hard to
6  estimate, not just in this case, in a lot of cases, in
7  practice, the exact stresses.  This, again, requires a
8  law of input for the problem.  So, again, you don't do
9  any of that.  You know, there is no need to do all of
10 this when it's clear what happened.  So in this case,
11 no, you don't need to do any of that.
12     Q.   Did you perform any hand calculations to
13 determine the stresses, stiffness, and deflection of
14 the RV steps at issue in this case?
15     A.   No, I did not do hand calculations, no.
16     Q.   All right.  Since you didn't employ any
17 calculations, tell me how you could arrive at your
18 conclusions without such calculations.
19     A.   How I arrived at which conclusions?
20     Q.   The conclusions that you have expressed in
21 your report.
22     A.   The evidence shows very clearly all the
23 things I said.
24     Q.   Okay.
25     A.   That their welding process, they didn't

58

1  where the top link is, where you had the weld, where
2  basically it broke the material next to it, and then
3  there is another one on the other side also, there is
4  another small ingress also, also caused by the welding.
5      Q.   Okay.
6      A.   And potentially the material selection,
7  again, that I mentioned earlier, because some materials
8  are more prone to hard phases or embrittlement, meaning
9  more easier to break down the line.
10     Q.   What do you know about the materials
11 selection for this subject set of RV power steps?
12     A.   I don't know the exact steel or material type
13 involved, or alloy involved, but it appears that, you
14 know, it is brittle, at least to some extent, that the
15 cracks can run through it, can fracture easily.
16     Q.   What prior experience do you have in
17 evaluating the design or use of power steps of the type
18 that we have in this case?
19     A.   Not specifically these steps, but steps, in
20 general, products, in general, components, in general.
21 That's what we teach.
22     Q.   Okay.
23     A.   How they should be designed properly, how
24 they should be manufactured properly, how they should
25 be -- how would they fail in the existence of such

61

1  to power step design or manufacturing; is that correct?
2      A.   Those specific steps, no.
3      Q.   Okay.  Did you inspect the specific steps
4  that are the subject of this litigation?
5      A.   Did I inspect them, yes.
6      Q.   Okay.  When?
7      A.   Early in the case.  I don't remember.  It was
8  2012.  Something like that.
9      Q.   And where did you inspect them?
10     A.   They were at the lawyer's office.
11     Q.   At Jack Travers' office?
12     A.   Yes, at the time.
13     Q.   Who else was there with you?
14     A.   I don't remember.  I believe both of us were
15 there.  I don't remember if there was somebody else.
16     Q.   Okay.  For example, was his client, Nedra
17 Denison, there, the woman who is the plaintiff?
18     A.   I honestly don't remember.  Her husband may
19 have been there at one point.  You know, I don't --
20 this has been awhile back.
21     Q.   Okay.  So tell me about what the process was
22 when you inspected the steps and what happened during
23 the course of that inspection.
24     A.   So the process was -- I mean, these are
25 foldable steps, okay?  So you can unfold them.  You can

62

1  open them up. So we looked at them in both states, as
2  they fold or unfold, and I looked at the -- you know,
3  the broken weld area. And so I examined that. And
4  then what else? And, again, I did talk to Nedra, or
5  mostly her husband, I guess, about what's going on,
6  basically what happened.
7     Q.  What information did you gather from Mr.
8  Denison?
9     A.  That she stepped on them, and when she
10 stepped on them, she lost her balance and then she
11 fell, broke her arm, and whatever, sprained her --
12    Q.  Okay.
13    A.  And then at the same time, he looked at it
14 and found that there was basically a breakage there, a
15 fracture, and he pointed it out to me, where the
16 fracture area was. So I did see it. It looked like it
17 was fractured, indeed.
18    Q.  Did he give you any other information that
19 you relied on for any purposes for the opinions you
20 developed in this case?
21    A.  I'm trying to remember. I don't think so.
22    Q.  And do you recall what information Nedra
23 Denison gave you, if any?
24    A.  I mean, it was that, in a nutshell, I mean.
25    Q.  Well, so far, you have not told me anything

64

1     Q.  But you never actually physically saw them?
2     A.  No, I did not physically see them.
3     Q.  Okay.
4     A.  The pictures, which are actually part of my
5  report, shows them. They are of the motor home.
6     Q.  Okay. Did you ever inspect any exemplar
7  steps, steps that were from the manufacturer of the
8  same kind of steps?
9     A.  No.
10    Q.  Did you interview any other witnesses besides
11 the conversation you described with Nedra and Alan
12 Denison?
13    A.  No.
14    Q.  Did you take any measurements during the
15 course of your inspection of those steps?
16    A.  I don't think I took measurements. Goff, the
17 photographer, used some rulers to indicate scales and
18 things in his picture, but I don't think I had to do
19 any measurements myself.
20    Q.  Okay. Did you use the photographs that have
21 a ruler or a yardstick in them in any way in your
22 analysis in terms of showing the scale, as you describe
23 it?
24    A.  They are there in my report, but I wasn't
25 emphasizing necessarily in my report the scale. So I

72

1     A.  Okay.
2     Q.  This is where you describe your expertise
3  that you bring to this case and the analysis that you
4  conducted here. The first thing that you say is that
5  "Dr. Khraishi is an expert in materials
6  science/engineering."
7         Could you just briefly give me an overview of
8  what your background is in that field of materials
9  science/engineering?
10    A.  What do you mean?
11    Q.  Your educational and work history that
12 relates to that field.
13    A.  Okay. So I have a Ph.D. relating to
14 materials science and materials engineering.
15    Q.  Okay. And when did you get your Ph.D.?
16    A.  And undergraduate courses also relating to
17 that.
18    Q.  When did you get your Ph.D.?
19    A.  My Ph.D., in 2000.
20    Q.  And from what institution?
21    A.  Washington State University.
22    Q.  And ever since then, you have been a
23 professor at the University of New Mexico?
24    A.  That's correct.
25    Q.  Okay. And what is your title as a professor?

73

1     A.  It's professor of mechanical engineering.
2     Q.  Okay. And then you indicate that you are
3  also an expert in mechanical design.
4         Can you tell me what you mean by that area of
5  expertise?
6     A.  Design of components and systems.
7     Q.  Okay. And what is your background that you
8  believe gives you --
9     A.  Which is --
10    Q.  Let me finish the question.
11        What is the background that you believe gives
12 you the expertise to talk about mechanical design?
13    A.  What is the background?
14    Q.  Yes.
15    A.  Because I studied those as an undergrad and
16 graduate. So that's part of my study.
17    Q.  Okay.
18    A.  Throughout my college careers, all of them,
19 as well as teaching. That's part of my teaching, both
20 in design and in materials. So I teach these courses.
21    Q.  Okay.
22    A.  And these materials.
23    Q.  And so that would be your educational
24 background that contributes to your expertise in
25 mechanical design?

74

1  A. That is correct.
2  Q. Okay. Do you have any work for any
3  manufacturing company in mechanical design, any work
4  experience in mechanical design for a company?
5  A. So I want to add another thing. It's not
6  just my educational background, so where I took
7  throughout my career courses and training in these
8  areas, these specialties, but, also, my research
9  areas. So I do research in all of these areas, as
10 well.
11 Q. Is there any particular research that you
12 have engaged in that you feel contributes specifically
13 to your analysis of the problems in this case involving
14 these power steps?
15 A. Specific ones, again, in general, yes. I
16 mean, a specific one, I don't know, because I have done
17 a lot of research and a lot of teaching. And I have
18 taken a lot of courses.
19 Q. Okay. And I don't think I got an answer to
20 my prior question.
21 A. Yes.
22 Q. Which was, do you have any work experience in
23 working as a mechanical engineer who is involved in the
24 design of products for a particular manufacturer?
25 A. Yes, at the research level and at the

75

1  teaching level, yes, I have work experience.
2  Q. Okay. What is your work experience in
3  assisting a manufacturer design a product?
4  A. I supervise students who design different
5  products and teach them how to design them.
6  Q. Okay. Well, my question is your experience
7  in working directly for manufacturers in designing
8  products.
9      Do you have any experience in that?
10 A. Did I work for a manufacturer?
11 Q. Yes.
12 A. No.
13 Q. Let's talk a little bit about the next area
14 of expertise that you describe here, which is
15 "mechanics of materials."
16     Do you see that in paragraph two?
17 A. Yes.
18 Q. Tell me what you mean by that.
19 A. So mechanics of materials related to
20 mechanical design. So mechanics of materials relates
21 to different products, components, systems, when they
22 are subject to physical forces, what happens to them,
23 how do they respond, and what happens to them.
24 Q. Okay.
25 A. So that's a science and a field that engages

76

1  in these.
2  Q. And I assume your expertise here comes from
3  your educational background and the degrees that you
4  have obtained in mechanical engineering; is that
5  correct?
6  A. Yes, in addition to all the research I have
7  done also in the area.
8  Q. Okay. And then the next area that you list
9  is "manufacturing/fabrication techniques."
10     What do you mean by that?
11 A. How are things manufactured, engineering
12 products, products in general, but specifically,
13 engineered-type products, how are they manufactured.
14 There are different techniques that can be employed for
15 manufacturing different things and there are proper
16 techniques versus non-proper techniques.
17 Q. Okay. And have you done any specific work as
18 an educator in the field that specifically relates to
19 the manufacturing or fabrication of power steps of the
20 type in this lawsuit in the past?
21 A. Specifically, the power steps, no, but,
22 again, this is a -- no, specifically for power steps,
23 no.
24 Q. Okay. Is there any other area of expertise
25 that you intend to draw upon in this case for opinions

77

1  you intend to testify about in this case besides the
2  ones you have mentioned here?
3  A. I don't believe so.
4  Q. Okay. Do you consider yourself an expert in
5  industrial engineering related to power steps for motor
6  homes?
7  A. Again, I am not specifically engaged in power
8  steps.
9  Q. Okay. Generally, do you consider yourself an
10 expert in human factors?
11 A. I know about human factors. That's part of
12 the design process we teach, yes, we teach human
13 factors, anthropometry. So we teach that part as part
14 of the design, mechanical design.
15 Q. And what was the phrase that you used?
16 A. Anthropometry.
17 Q. How do you spell that?
18 A. A-n-t-h-r-o-p-o-m-e-t-r-y.
19 Q. And what is that?
20 A. It's also a study of human factors,
21 basically.
22 Q. Okay. And tell me, when you talk about
23 "human factors," what do you mean?
24 A. It means when you are engaged in design of
25 products, the design should be suitable to an intended

1  A. That step especially when you step on it,
2  would come closer to -- so it would collapse onto each
3  other, in other words.
4  Q. Did you take any measurements of how much
5  closer, if any, the steps were?
6  A. No, I did not do any measurements.
7  Q. Okay. Why not?
8  A. I didn't have to.
9  Q. Why not?
10 A. I didn't have to. It was clear that by
11 looking at this, it was bent down, by Figure 7, to look
12 down, the step is going down.
13 Q. And how can you tell that from Figure 7?
14 A. I can tell. Figure 7 shows that the link has
15 gone down.
16 Q. Okay.
17 A. In the vertical sense.
18 Q. Can you take this purple pen and -- you have
19 the original exhibit, don't you?
20 A. Uh-huh.
21 Q. Yes. Can you take this purple pen and circle
22 for me where you think it indicates that the link is
23 going down in the manner you are describing?
24 A. It's going down here vertically.
25 Q. Okay. And you circled pretty much the whole

1  link.
2  Can you show me more specifically with maybe
3  an arrow pointing to where you think it's going down?
4  A. It's going down here. This is how it's
5  supposed to be.
6  Q. Okay. So you have drawn a line across to
7  show how it's supposed to be?
8  A. Yes.
9  Q. Did you measure that change to the link to
10 determine how much it was going down, as you describe
11 it?
12 A. Did I measure the change, the degrees here?
13 Q. Yes.
14 A. No.
15 Q. And why didn't you measure that?
16 A. Again, I don't have to. It's very obvious
17 that there is a tilt in all the pictures.
18 Q. Okay.
19 A. And when I saw it in person also.
20 Q. Okay. The next sentence in paragraph number
21 one, "She suffered injuries, including acute distal
22 radius fracture (broken right arm) and ankle injury
23 (strain, sprain)."
24 Where did you get that information?
25 A. I believe it was interaction with the law

1  that you should recognize the need or identify the
2  problem.
3  A. Yes.
4  Q. Do you see that?
5  A. Yes.
6  Q. Do you agree with that as a factor in
7  performing the Scientific Method?
8  A. Yes, you have to -- there has to be a need,
9  correct.
10 Q. And then the next step is to define the
11 problem.
12 Do you see that?
13 A. Yes.
14 Q. Do you agree with that?
15 A. Yes, you should also try to define what the
16 problem is.
17 Q. And then it moves on to collecting data.
18 Do you see that?
19 A. Yes.
20 Q. And it sounds like you would agree that you
21 should collect data?
22 A. Yes, you should collect data, correct.
23 Q. And then it instructs us that the next step
24 would be to analyze the data.
25 Do you see that?

1  A. Yes.
2  Q. And I assume you agree with that?
3  A. Yes.
4  Q. And then the next step it identifies is to
5  develop a hypothesis or engage in inductive reasoning.
6  Do you see that?
7  A. I see that.
8  Q. And do you agree with that, as well?
9  A. Yes. I mentioned the hypothesis just a few
10 seconds ago.
11 Q. Okay. And then it says that the next step in
12 performing the Scientific Method would be to test the
13 hypothesis or engage in deductive reasoning.
14 Do you see that?
15 A. Yes, if you have to, you do that, that's
16 correct.
17 Q. And finally, it says you should select the
18 final hypothesis.
19 Do you see that?
20 A. Yes. Basically, this is called a conclusion
21 in a sense, yes.
22 Q. So you would agree that when you are
23 performing that Scientific Method, you should engage in
24 the steps that we see in Exhibit 42, it sounds like?
25 A. Yes, you should engage in steps like this,


**Page 100**

1  that's correct.
2  Q.  Okay. And so let's think about it in this
3  case, you know, in this case, did you identify the
4  problem?
5  A.  Yes. There was a need, and the need was
6  dictated by the accident that happened. So the
7  problem, what exactly is the problem, that is what I
8  was able to look into, and by inspection, the problem
9  is there was a fracture, okay, and -- or, rather,
10 instability in the steps that caused that fall to
11 happen.
12 Q.  Uh-huh.
13 A.  And then in terms of the data, you have to
14 collect -- again, I mentioned that earlier, you have to
15 look at evidence, you have to look at what you have.
16 Q.  Uh-huh.
17 A.  So that's called "collecting and analyzing
18 the data." So we did that, we looked at the steps
19 carefully to see what's going on, why there is a tilt,
20 why there is an instability that would cause somebody
21 to trip.
22      So we looked at that, and that was part of
23 all those pictures you saw in the report in terms of
24 the -- we discovered all the ingress, and then there is
25 further cracking on one side, the side that caused the

**Page 101**

1  tripping and what it is the hypothesis for that the
2  hypothesis is what is listed here.
3  Q.  In your report?
4  A.  Yes, in the report, that this could be due
5  to, you know, the material choice. You know, they
6  could have chosen material, for example, that is more
7  prone to embrittlement, that's a hypothesis here.
8  Q.  Okay.
9  A.  And the other one, that this is a
10 heat-affected zone. Again, this relates to the welding
11 spot area, that there is a heat-affected zone where the
12 embrittlement happened.
13 Q.  Okay.
14 A.  And there is potentially martensite inside of
15 the microscopic lever.
16 Q.  Okay.
17 A.  But the other hypothesis could have been that
18 there was not proper heat treatment, which I mentioned
19 earlier. For example, there is a proper cooling rate,
20 you know, that you have to do for welding so that you
21 will try to avoid the formation of brittle phases.
22 Q.  Okay. Did you test --
23 A.  So this is all part of the hypothesis.
24 Q.  Okay. And does that cover the hypotheses
25 that you developed in your evaluation of the evidence?

**Page 102**

1  A.  I believe so, yes.
2  Q.  Okay. What did you do to test each of your
3  hypotheses?
4  A.  To test which one?
5  Q.  Each one.
6  A.  I did not test for martensite.
7  Q.  Okay. Why not?
8  A.  In this case, you didn't have to, again,
9  because there was ingress, followed by further cracking
10 or fracture that caused the steps to clearly be tilted
11 and not be even, level, and cause a fall for an
12 unexpecting person, or if it happened immediately at
13 that time, the further cracking.
14 Q.  And what information did you rely on for
15 reaching that conclusion that you did not have to test
16 for martensite?
17 A.  I already told you. I already told you.
18 First of all, it is known that steel, in general, could
19 form martensite, especially if it is not heat-treated
20 well, or if they are welded and they are not given the
21 proper cooling rate. This is established information
22 that people teach in their courses.
23 Q.  Okay.
24 A.  So I don't necessarily, you know, have to
25 look for that, but the fact that there is a fracture

**Page 103**

1  and there shouldn't be a fracture in these areas points
2  a finger to the way they did the welding, where they
3  caused an ingress and then the further cracking.
4       My hypothesis has to do with there is an
5  embrittlement happening there and the ingress
6  existence. The ingress existence, itself, according to
7  what is taught to everybody, can cause further cracking
8  by itself. So if you combine that with the possibility
9  of martensite, even a brittle phase locally there, more
10 brittle than the other parts of the steel, that that
11 even makes things worse.
12 Q.  Okay. So let's focus just on the martensite
13 for the moment.
14 A.  Yes.
15 Q.  You have testified today that it's
16 "potentially there" and that it's "possibly there."
17      As I understand your testimony, you have not
18 actually determined that the martensite is present in
19 this steel; is that correct?
20 A.  No, I have not determined that.
21 Q.  Okay.
22 A.  Or other brittle phases also.
23 Q.  Okay. What would you have to do to determine
24 that there is martensite present in the steel?
25 A.  So, again, there might be another brittle

1 phase. What do I have to do? I have to do a
2 microscopic examination.
3    Q.  And would that involve destructive testing?
4    A.  Yes.  Yes.
5    Q.  So you would have to cut open the steel?
6    A.  Break and cut open, yes, correct.
7    Q.  And then what would you do after you cut open
8 the steel?
9    A.  You would have to do grinding and polishing
10 and then microscopy and then maybe even high-end
11 microscopy, where you can look at the martensite
12 structure.
13    Q.  Okay.  And you did not do that here because
14 you felt it was not necessary?
15    A.  No, I felt it was not necessary.
16    Q.  Okay.  And I believe you have also testified
17 that there is possibly embrittlement here.
18    A.  The embrittlement is related to the
19 martensite or another phase.
20    Q.  What would you have to do to -- in other
21 words, you don't know for a fact that there is
22 embrittlement in this steel; is that correct?
23    A.  Not on the micro level, no.
24    Q.  Okay.  And why didn't you conduct the
25 analysis to determine whether there actually -- let me

1 finish the question.
2    A.  Yes.
3    Q.  Why didn't you conduct the analysis necessary
4 to determine whether or not there is actually
5 embrittlement present in this steel, as well?
6    A.  I mentioned earlier that steel, in general,
7 especially when you are doing welding, you know, you
8 could end up with steel formation of martensite,
9 especially if you're not doing the proper heat
10 treatment or cooling rate.
11         So that's part of it, but, also, the -- what
12 do you call it?  In this particular case, you don't
13 have to, because there was a large -- the large
14 cracking is causing the instability, the large
15 fractures that happened, which caused somebody to lose
16 their balance, especially if they are unexpecting and
17 stepping on it while not knowing this already happened,
18 or happened once, they stepped on it, and then the
19 crack grew suddenly, because crack growth can be quick,
20 it doesn't have to be slow, especially when it's
21 stress-related.
22    Q.  So is it fair to say that you cannot say to a
23 reasonable degree of engineering probability that there
24 is martensite in this steel?
25    A.  Do I know for a fact there is martensite or

1 other brittle phases, there are indications of it, but
2 I cannot tell 100 percent if there is without doing the
3 examination, the microscopic examination.
4    Q.  I appreciate that, but my question is a
5 little different than that.
6    A.  Yes.
7    Q.  I am asking you whether, to a reasonable
8 degree of engineering probability, you can say whether
9 or not martensite is present in this steel without
10 doing the destructive testing that you described.
11    A.  There is probably some brittle phase.  I can
12 say that, there is brittleness.  There is probably some
13 brittle phase with the martensite or another phase
14 brittle locally there in that area.
15    Q.  So as I understand it, you can't say to a
16 reasonable degree of engineering probability that
17 martensite is present in this steel?
18         MR. TRAVERS:  I'm going to object.
19    Q.  (By Mr. Erickson)  Go ahead and answer the
20 question.
21    A.  I think there might be some.  I cannot tell
22 100 percent, but I think there might be some brittle
23 phase, yes.
24    Q.  Okay.
25    A.  There might be if it's examined.

1    Q.  And what do you mean when you use the word
2 "might"?
3         I mean, how likely is "might"?
4    A.  Fifty percent.
5    Q.  Okay.  And there might not be 50 percent,
6 too, right?
7    A.  There might not be, yes.
8    Q.  Okay.
9    A.  Yes.  Again, you cannot tell these things.
10 There is an indication that there is because of the way
11 the fracture looks like a brittle fracture.  There are
12 different types of fracture.  This type of fracture is
13 what I would call a brittle type fracture because of
14 the way it looks.
15    Q.  And turning back to your report, Exhibit 41,
16 can you show me in a photograph what about the
17 appearance of this fracture makes you think that it's a
18 brittle fracture?
19    A.  Yes.  So the way -- for example, if you look
20 at Figure 3, do you see here how it's -- it is sharp,
21 the fracture is sharp and pointed?
22    Q.  Why don't you circle that area with the
23 purple pen on Figure 3 that you were just pointing to?
24    A.  This area here.
25    Q.  Can you try to make it a little darker, if

1  look more blun Case 1:14-cv-00531-KG-KBM   Document 61-1   Filed 10/07/15   Page 9 of 13
2     Q.  Okay.  Do you see any features in Figure
3  Number 3 of this being a ductile fracture?  I'm looking
4  at Figure 3.  We can look at other ones, too, but I
5  want to ask you about Figure 3 since we are on it.
6     A.  Yes, I know.  I know.  It's not.  The angle
7  is not as easy as the other ones.
8     Q.  Okay.
9     A.  But yes, again, it looks more brittle to me,
10  like I said, just by looking at it.
11     Q.  Okay.
12     A.  Again, brittle and ductile, it's not a sharp
13  delineation between them, the way they are defined in
14  the literature.  People just talk about them.  And
15  normally, when they describe them, they describe them
16  in the extremes, meaning a good example of brittle is a
17  glass breakage, you know, typical glass.
18        So they tell you, "Okay.  Look at this
19  surface, see how it is a clean-cut, more faceted-type
20  face or surface of the structure," and it's not as
21  rough if you try to punch it, and a roughness also
22  indicates shininess in terms of metal.  So if it's
23  rough, it's not as shiny as if it is more flat.
24     Q.  Okay.  My question is just whether, in Figure
25  Number 3, you see any features that suggest a ductile

1  fracture at all?  I recognize that different pictures
2  can show different things.
3     A.  Yes.  Again, I cannot tell you the degree of
4  embrittlement or the degree of ductility, which is the
5  opposite of embrittlement.  So the exact degree, you
6  know --
7     Q.  And I am not asking for an exact degree.
8     A.  Yes.
9     Q.  I am just asking whether, when you look at
10  this fracture that we see in Figure Number 3, are there
11  any -- is there anything there that suggests to you
12  that this was a ductile fracture?
13     A.  The way I'm looking at it myself, it looks
14  more of a brittle fracture.
15     Q.  Okay.
16     A.  That's the way I look at it.
17     Q.  The next question is, what's the significance
18  of finding a brittle fracture as opposed to a ductile
19  fracture?
20     A.  Good question.  I wrote in the report, and I
21  believe I touched on it previously today, if something
22  is brittle, especially if it already has a notch in it
23  or an ingress, okay, so if it has some brittleness to
24  it, it could cause easier breakage down the line.
25        So if you apply forces later to that area,

1     A.  No, not the very specific details, no.
2     Q.  Okay.  Then on March 11th, 2015, it says,
3  "Working on the federal report and other docs, e.g.,
4  fee schedule, plus communicating with John."
5        Do you remember what you discussed on March
6  11th of this year?
7     A.  So, I mean, again, whatever it says here,
8  that I was asked to produce a report, and then, for
9  example, there was a fee schedule document he asked me
10  to produce.
11     Q.  Okay.
12     A.  So I e-mailed him or I talked to him on the
13  phone.  Sometimes communication was over the phone.
14  Many times it was over the phone, actually.
15     Q.  Okay.  Dr. Khraishi, we talked about what
16  your hypotheses were this morning.
17        My question is, did you consider other
18  hypotheses and evaluate them as required by the
19  Scientific Method that we have talked about?
20     A.  No.  These are the hypotheses listed here in
21  my report.
22     Q.  Okay.  Why didn't you consider other
23  hypotheses?
24     A.  Because this is what I can hypothesize
25  myself, is what I managed to hypothesize, is these

1  ones.
2     Q.  Okay.
3     A.  I don't have to consider anything that
4  doesn't come to mind.
5     Q.  Okay.  And as I understand it, you performed
6  no testing to evaluate your hypotheses; is that
7  correct?
8     A.  I did not do microscopic-type testing,
9  because, again, that's not important for what caused
10  the fall.
11     Q.  Okay.
12     A.  So it could have contributed to it, yes, you
13  know, but, again, what caused the fall is the existence
14  of the cracking that destabilized her.  So that's what
15  caused it, but the other thing is more an "Okay.  What
16  may have been going on there right there on the spot."
17  That's the hypotheses.
18     Q.  Okay.  And my question wasn't limited to
19  microscopic testing.
20     A.  Yes.
21     Q.  My question was, you didn't perform any
22  testing to evaluate your hypotheses?
23     A.  No, I did not do testing.
24     Q.  Okay.  Did you reach -- well, let me ask the
25  question this way.

```
 1    Q.  Did you eliminate to a reasonable
 2  engineering probability that there was, in fact,
 3  improper heat treatment of the weld area on this brace
 4  in question?
 5    A.  Yes.  I mean, I believe so, the way the
 6  fracture happened.
 7    Q.  And what methodology did you employ to make
 8  that determination?
 9    A.  Again, concepts and knowledge of fracture
10  mechanics and fractography, how fractures happen and
11  how they look, how do they look, those fractures, so
12  you could shed some light on that.
13    Q.  Do you know whether the subject steps that we
14  have been talking about or any of its components
15  actually received a post-weld heat treatment?
16    A.  Do I know, no.
17    Q.  When you were evaluating the various
18  hypotheses that should be evaluated in this case, did
19  you consider whether the post-incident condition of the
20  steps was consistent with an overload such as Ms.
21  Denison falling on the steps?
22    A.  What's that?
23    MR. ERICKSON:  Denise, would you read the
24  question back, please?
25    MS. KOPAN:  "When you were evaluating the
```

```
 1  meteorite hitting the site and the other was her
 2  falling, and I don't think we have any suggestion --
 3  let me finish.
 4        I don't think we have any suggestion that a
 5  meteorite hit the site, but we do know that, according
 6  to her story, she fell on that day.
 7    A.  No, I don't know that story, that she fell.
 8  All I know is she fell off of it.
 9    Q.  Did you consider whether there was any kind
10  of overload on the steps that caused the damage to the
11  steps that we see?
12    A.  No, I did not consider overload, because,
13  again, I was not told there was any overload.
14    Q.  Okay.  Do you believe that the condition of
15  the post-incident steps is consistent with an accident
16  in which Ms. Denison fell on the steps as she exited
17  the RV?
18    A.  Can you repeat that again?
19    Q.  Yes.  Do you believe that the condition of
20  the steps after the accident was consistent with an
21  accident in which Ms. Denison fell on the steps as she
22  exited the motor home?
23    A.  I mean, I cannot talk to that, to falling,
24  because that's not what I know, that there was a
25  falling or anything on the steps.
```

```
 1    Q.  Okay.  Well, I am just asking you whether the
 2  condition of the steps could be consistent with a
 3  falling or an overload on the steps.
 4    A.  Again, I cannot answer hypothetical questions
 5  because you can ask me many things, like a bear fell
 6  from the top of the RV, is this consistent with that.
 7  I cannot answer that hypothetical question.  So I don't
 8  know.
 9        All I know is this -- is what I was told,
10  that she fell and lost her balance and she fell, but,
11  again, what caused that, my hypothesis is there is an
12  initial ingress, and that ingress could grow, you know,
13  with something as tipping on it over time, because you
14  cannot control these things.  It's not like, "Okay,
15  it's going to happen in the next second or next" -- you
16  know, it's hard to know when it's going to happen, the
17  further progress.  So no, I did not.
18    Q.  Okay.  Did you do anything to rule out
19  overload as a failure mechanism in this incident?
20    A.  Did I do anything to rule out?
21    Q.  Yes.
22    A.  No, I did not do anything specific to rule
23  out what the cause was.
24    Q.  Okay.  So in paragraph three of your report
25  at Exhibit 41, you state, halfway through the
```

```
 1  paragraph, this is on the very first page, paragraph
 2  number three, you state two different possibilities.
 3  You state, for example, it could indicate what you see
 4  in this zone of brace, it could indicate an embrittled
 5  material with martensite formation in the steel, and
 6  then you go on to say, "Also, it could indicate
 7  improper heat treatment of the weld area after welding
 8  to avoid brittle spots."
 9        Did you make a determination to a reasonable
10  degree of engineering probability that either one of
11  those possibilities actually is the one you believe
12  occurred?
13    A.  Yes.
14    Q.  And what decision did you make?
15    A.  That one of them occurred for sure, if not
16  both.
17    Q.  And my question --
18    A.  Again, the point I need to keep emphasizing
19  is this is a hypotheses on the microscale.  Microscale
20  is normally one word.  So, again, the existence of the
21  ingress, the initial fracture, by itself, is
22  detrimental to the structure integrity of the link and
23  the steps and could cause further propagation or growth
24  of the crack that we have seen already in the
25  different-colored surface, one rusted, one not rusted.
```

142

1    And so, again, this could be the underlying
2    cause of why, you know, it fractured further, is
3    because the material type is prone to martensite or
4    bainite, which is another phase, another brittle phase,
5    or, you know, they did not heat-treat it properly.  So
6    that also could cause brittle -- or embrittlement, the
7    brittle phases.
8         Q.   But as I understand it, you have not made a
9    decision as between those two possibilities as to which
10   one actually occurred in this case?
11        A.   You know, I am not sure which one occurred,
12   no, I am not sure, but, again, one or the two or both
13   occurred.
14        Q.   Let's move on to paragraph four, the next
15   paragraph down.  And it appears to me that you stated
16   it essentially twice; it's the same opinion.  In the
17   second full sentence at the top of paragraph four, it
18   says, "On the left side of the picture," referring to
19   Figure 1, "there is a top link that broke and caused
20   Nedra's losing balance."
21             Do you see that sentence?
22        A.   Yes.
23        Q.   And then at the end of the paragraph, it
24   says, "The loss of stiffness in the structure due to
25   this large crack caused Nedra to lose her balance and

152

1    expert who can opine on a person's balance and causes
2    for loss of balance?
3         A.   I am not an expert on just balance and causes
4    of balance, but, again, the documents that you have,
5    and, like you said, people, themselves, who have
6    experienced that know you can have loss of balance from
7    misalignments and where they are stepping and uneven
8    surfaces.
9         Q.   Okay.  Did you measure or calculate the loss
10   of stiffness that you describe in the steps in
11   paragraph four of your report?
12        A.   Did I measure or calculate?  No.  It's
13   actually obvious.  You don't have to calculate it,
14   because the -- that's why, when you look at the stairs,
15   they are hanging on the RV, they are tilted.  The
16   reason they are tilted, this is a loss of stiffness.
17   They are not as stiff as they were before the large
18   crack, in other words.
19        Q.   Did you know what the stiffness of the steps
20   was before the accident?
21        A.   No, because it depends on how you want to
22   define "stiffness" and how you want to measure
23   stiffness and all of that.  Again, these are technical
24   jargon.  When you say technical stuff and you are
25   trying to quantify them, then that's different.

154

1         Q.   Do you know whether the steps tilted at all
2    prior to this accident?
3         A.   Prior to the accident, no.  I am assuming
4    they were not tilted; otherwise, they wouldn't lose
5    their balance when they are going up and down, both of
6    them, for a period at least until that happened, then
7    this must have happened.
8         Q.   Are you aware of the fact that they continued
9    to use these steps after the accident without falling
10   from them?
11             MR. TRAVERS:  Excuse me?
12        Q.   (By Mr. Erickson)  My question was whether
13   you are aware of the fact that Mr. and Mrs. Denison
14   continued to use these steps on this mobile home after
15   the accident without incident or fall.
16        A.   They continued to use them?  I don't know if
17   they continued to use them or not.
18        Q.   Yes.  Let's move on to paragraph five of your
19   report.  The first sentence, I just want to make sure
20   what you are referring to.
21        A.   Yes.
22        Q.   It says, "Upon further examination of the
23   right side of the steps that did not have this large
24   crack."
25             Do you see that?

159

1         A.   Yes.
2         Q.   And with reference to the phrase "even by a
3    few degrees," my understanding is you didn't make any
4    determination of what the measurements were regarding
5    the change that you have identified in horizontal
6    level; is that correct?
7         A.   I did not measure the exact degrees of tilt,
8    no.
9         Q.   And, again, you're not testifying as a human
10   factors expert in this case about Nedra's loss of
11   balance; is that correct?
12        A.   You know, again, I am not.  I have expertise
13   in human factors and anthropometry, but I am not here
14   trying to argue.
15             MR. TRAVERS:  Can we have a break?  I need to
16   answer this.
17             MR. ERICKSON:  I want to finish this line of
18   questioning first.
19             THE WITNESS:  Yes.
20        Q.   (By Mr. Erickson)  Okay.  You don't know how
21   level the steps were prior to the incident, in other
22   words?
23        A.   No, I did not see them prior.
24        Q.   Do you know what the threshold is or tipping
25   point in terms of loss of horizontal leveling that

166

1  potentially -- strike that, you know, as we
2  call it, meaning it is more prone to fracture.
3           On top of that --
4     Q.   Can I just ask you a question?
5           MR. TRAVERS:  I'm going to object.  Let him
6  finish.
7           MR. ERICKSON:  I'm going to let him finish,
8  but I also want to ask him before we move on to his
9  next point.
10          MR. TRAVERS:  But you can't interrupt him
11 until he is finished.
12    Q.   (By Mr. Erickson)  Okay.  Go ahead.
13    A.   So that's part of it.  The other part is they
14 may not have used the best materials for the step.  In
15 which sense, again, in the sense that they used one
16 that is more prone to brittle phases inside, to the
17 formation of brittle phases.
18          And there is another aspect to it, is even if
19 they used okay materials, did they not properly
20 heat-treat it.  To make sure they do not allow for
21 brittle phases inside, they have to properly heat-treat
22 and use, you know, cooling grade that is low to avoid
23 this and do an annealing process, a-n-n-e-a-l-i-n-g,
24 again, to improve the fracture toughness of the
25 material.

167

1  heating source.  So they could easily put it, and then
2  -- on here, it's hard.  Oh, here it is.  This is a
3  better picture, Figure 5.  Figure 5.
4     Q.   So why don't you circle for me on Figure 5
5  with one of the colored pens where the weld is that you
6  are concerned about.
7     A.   Yes.  So here.  You see, when they put this,
8  so with a torch, they could cut right into that.  Here,
9  they could not cut in the middle; why, because of the
10 way it is, it's continuous on both sides, but where
11 it's discontinuous, where it stops, okay, and where it
12 stops is basically hanging in the air, it's basically
13 like a cantilever under it.  So this is dangerous and
14 they could create a problem right there.
15    Q.   So just to make the record clear, I want you
16 to circle the area that you are talking about in red.
17    A.   In Figure 5?
18    Q.   Try the purple one, too, and see if that
19 shows up better.
20    A.   Which one, this?
21    Q.   Yes.  Okay.  That's better.  Thank you.
22          Okay.  So with respect to the materials, as I
23 understand it, you don't actually know the specific
24 alloys of the materials?
25    A.   No, I do not know the specific alloy.

168

1          Because this is a known problem, is when you
2  do welding, you could embrittle the material,
3  especially in the heat-affected zone like I mentioned
4  in the report.  So they need to do a combination of all
5  of these things really to ensure that hey, this is not
6  going to create problems down the line and fracture and
7  all of this.
8           So what's your question?
9     Q.   Yes.  My specific question about the welding
10 component of what you were talking about is, what was
11 wrong about the welding, as you see it, that resulted
12 in this initial ingress that you have identified in the
13 brace?
14    A.   Oh, what was wrong about it?
15    Q.   Yes.
16    A.   So the way they placed it -- again, this is
17 part of the overall design, the way they placed it.
18 You see the bead here?
19    Q.   You're looking at Figure what?
20    A.   Let's look at Figure 4, for example.
21    Q.   Okay.
22    A.   Although Figure 3 also kind of shows it.  So
23 when they put the weld -- you see this?
24    Q.   Yes.
25    A.   Because it's a heating source, directed

169

1     A.   Yes, Figure 5.  When they went all the way to
2  the end here, that's where the danger is.  They could
3  have done that cut, the one where it's hanging
4  basically over air.
5     Q.   By the "end," you mean the edge over which
6  the brace or the link is attached to the crosspiece?
7     A.   This is the link, I am calling this.
8     Q.   Yes.  The whole thing?
9     A.   With the arm, I think, or what is this?
10 Yes.  Is this the arm?  One of them is the arm, one of
11 them are the steps -- the step, see?
12    Q.   Okay.
13    A.   Yes.  Yes.  I mean, here, Figure 7, but,
14 anyway, the point is that that's part of the problem, I
15 think, is they went too far into it and they created a
16 cut, but the other problem, again, is the type of
17 steel.  Did they use the tough one that doesn't, you
18 know, fracture as easily, did they also heat-treat it,
19 because welding like this, in general, you have to
20 heat-treat it properly.  Otherwise, you run the risk of
21 getting those hard phases that -- the brittle phases.
22    Q.   And you don't know whether they heat-treated
23 it or not; is that correct?
24    A.   I don't remember if I learned that, no.
25    Q.   All right.  Have you reached any conclusion

1  loading, will break through --

2          So that's part of fracture mechanics theory
3  and education, is -- especially in brittle-type
4  materials, you could get -- the crack would go very
5  quick.  So, again, there is a difference between the
6  initial ingress, which I believe was put in there by
7  mistake by them, they didn't know what they were doing,
8  and by the other crack which has caused the tilting of
9  the whole step and destabilization, and that happened
10 afterwards.
11      Q.  Are you aware of any other similar steps
12 failing in the way that you have described?
13      A.  No, I am not aware of similar steps.  I have
14 not been involved in step cases like this one, and most
15 of these cases, when they settle, they are not public,
16 anyway, and nobody knows about it.
17      Q.  Did you rely on any other materials other
18 than what we have talked about today in developing your
19 opinions that you have expressed in your report and in
20 your testimony today?
21      A.  No, I don't believe so.  I mean, again, there
22 were some e-mails back and forth, but I don't
23 think --
24      Q.  Between you and Mr. --
25      A.  Yes, my opinion was based on evidence and the

1  Scientific Method and, you know, my expertise and
2  knowledge of different fields of fracture mechanics,
3  solids mechanics, materials science, engineering
4  design, manufacturing.
5          So no, I don't think there were any other
6  things than what we have, and, of course, examining the
7  actual steps first, that was a big part of it, which
8  is, again, part of the Scientific Method.
9       Q.  And as I understand it, you have not
10 developed any alternative design to the design of these
11 steps that you would consider to be a safer design; is
12 that correct?
13      A.  No, I would not develop that, unless somebody
14 pays me a good amount of money, then I will engage in
15 step design.
16      Q.  Have you been asked to perform any additional
17 work or analysis on this case prior to trial by Mr.
18 Travers?
19      A.  Prior to trial?
20      Q.  Yes, prior to trial.
21      A.  What do you mean, "prior to trial"?
22      Q.  Well, for now, until trial occurs, if there
23 is a trial.
24      A.  Yes.
25          MR. TRAVERS:  I mean, if we get the steps